## Department of Highways Appeal.
## Mitchell Condemnation Case.

Argued November 16, 1966. Before ERVIN, P. J., WRIGHT, WATKINS, MONTGOMERY, JACOBS, HOFFMAN, and SPAULDING, JJ.

*William R. Mosolino,* Assistant Attorney General, with him *Guy S. Mamolito,* Assistant Attorney General, *John R. Rezzolla,* Chief Counsel, and *Walter E. Alessandroni,* Attorney General, for Department of Highways, Commonwealth of Pennsylvania, appellant.

*Adolph L. Zeman,* with him *Robert L. Zeman,* and *Zeman and Zeman,* for appellees.

OPINION BY JACOBS, J., March 23, 1967:

Robert E. Mitchell and Lenora V. Mitchell are owners of a 48.53 acre farm in Washington County.   In order to build a limited access state highway through that area the Commonwealth, by a condemnation dated April 11, 1962, appropriated 2.850 acres of the Mitchell property for construction of the highway, and severed a 2.14 acre tract from the balance of the Mitchell property.   A Board of View awarded the Mitchells $3,300 in damages, including detention damages of $443, or a net award of $2,857.   The Mitchells appealed the award and a trial was held in March of 1965 resulting in a verdict of $6,500 including detention damages, or a net award of $5,532.   Judgment was entered on the verdict.

The Commonwealth appeals on the grounds that (1) the court erred in holding that circuity of travel or difficulty in access caused the Mitchells by the new highway was an element of damages; (2) the court erred in refusing to allow testimony as to the price at which the property was listed with a brokerage firm shortly before condemnation, and (3) the verdict was excessive and contrary to law.

## I.

The Mitchells gained title to the property and a right to damages for the condemned portion in 1963 for a purchase price of $23,000.   The farm is improved with a six-room brick house and garage and two small barns and sheds.   The farm itself is in the shape of an "L". Township Route 708 abuts one end of the "L" and the improvements with a private driveway giving access to Route 708 are on that same end.   The acreage taken or severed by the Commonwealth is located at that end of the "L" which is farthest removed from the end where the buildings and driveway are.   Such acreage never had access to any public road except by traveling over the remainder of the farm.

Prior to construction of the limited access highway the Mitchells had three ways of driving over country "red dog" roads to Route 519, a state highway and the main road through the area. The most direct route was to drive out their private road to Township Route 708, then proceed left on Route 708 about 1,000 feet to Township Route 763 and then easterly on Route 763 to Route 519, a total distance of 1.1 miles. Once on Route 519 the Mitchells could drive in one direction toward Hendersonville or in the other toward Canonsburg. The new limited access highway cut off Route 763 between the intersections with Routes 708 and 519, thus forcing the Mitchells to take more circuitous routes over township roads to either Hendersonville or Canonsburg where they could then, if they were going farther, enter Route 519. The route to Canonsburg is now about 4 to 5 miles; the route to Hendersonville, 3.2 miles. Prior to the condemnation the respective distances were approximately 4½ miles and 2 miles via Routes 763 and 519.

The court below allowed the witnesses for Mitchell to consider the cutting off of Route 763 as an element of damages in determining the after value of the Mitchell property. Mitchell himself estimated his damages at $10,000. Edwards, a Mitchell witness, estimated damages of $7,750 of which he attributed $2,250 to the land actually affected, $1,500 to new fencing required and $4,000 to loss occasioned by cutting off Route 763. Buckley, the Mitchells' other witness, estimated damages at $8,350 of which he attributed $2,000 to the land affected, $1,500 to new fencing and the remainder, $4,850 to the loss of the use of Route 763. Two Commonwealth witnesses, who did not consider loss of Route 763 an element of damages, estimated damages to the Mitchell property as a result of the taking at $1,100 and $1,400.

In Pennsylvania in condemnation proceedings the words "consequential damages" have a special meaning. They are defined as those which "arise when property is not actually taken or entered but an injury to it occurs as the natural result of an act lawfully done." *Soldiers and Sailors Memorial Bridge,* 308 Pa. 487, 490, 162 A. 309 (1932). Damage to access is such a consequential damage. Id. at 492. Prior to the Eminent Domain Code of 1964, 26 P.S. §§1-101 to 1-901, the Commonwealth was not liable for such damage absent an actual physical taking of claimant's land. *Pane v. Department of Highways,* 422 Pa. 489, 222 A. 2d 913 (1966) ; *Anderson Appeal,* 408 Pa. 179, 182 A. 2d 514 (1962). From the record before us it appears that this condemnation was effected prior to the Code. Thus it is governed by the substantive law in effect prior thereto.

The appellees argue that an actual taking of their land has occurred and that, therefore, the cutting off of Route 763 is an element of the damages recoverable against the Commonwealth. A similar argument was made in the recent case of *Wolf v. Department of Highways,* 422 Pa. 34, 220 A. 2d 868 (1966), where the Commonwealth condemned a portion of a corner of the Wolf property and erected two concrete medial dividers on the abutting highway. But in that case, where the Supreme Court rejected the argument, as in this case, there was no connection whatsoever between the taking of a portion of the property and interference with traffic on the highway, which in the case at bar was not even an abutting highway. The closing of Route 763 at a point more than a half mile from the Mitchell driveway is not a *consequence* of the taking of part of their land.

Cases which have interpreted Article I, §10 of the Constitution of Pennsylvania, which imposes liability for land "taken or applied to public use", have made

it clear that only where damages follow from an actual taking of land can they be included in an award against the Commonwealth in eminent domain. Cf. *Wolf v. Department of Highways*, supra; *McCrady Case*, 399 Pa. 586, 160 A. 2d 715 (1960); *Lenhart v. Commonwealth*, 345 Pa. 528, 29 A. 2d 22 (1942); *Johnson's Petition*, 344 Pa. 5, 23 A. 2d 880 (1942); *Puloka v. Commonwealth*, 323 Pa. 36, 185 A. 801 (1936). The reason for this limitation is clear, since unless the damages are a part of the actual taking there can be no liability upon the Commonwealth under the Constitution. If they are part and parcel of the "taking", then liability exists under Article I, §10.

In *McCrady*, supra, relied on by the court below and by appellees, in order to construct high curbing along a highway the Commonwealth had to take a certain portion of the claimant's land. Damages due to a change in access were allowed since the actual taking of land was directly related to construction of the high curb which made access to the property extremely difficult. Although the curbing was installed on land owned by the Commonwealth, its installation depended on the taking of a portion of the claimant's land for slope purposes; thus the two acts were so interrelated as to justify recovery for the damages to access as a *direct* result of the taking of claimant's land. In the present case there is no connection between the taking of the land in one corner of the Mitchell property and the closing of Route 763 at another point some distance from any part of the Mitchell farm.

Even if Section 612 of the Eminent Domain Code, 26 P.S. §1-612, were considered applicable under the reasoning of *Pane v. Department of Highways*, supra,[1] or

---

[1] *Pane* holds that the injury resulting in consequental damages is incurred at the "time the work is actually undertaken." The record in this case, which is factually unclear in a number of instances, does not indicate when the work was actually undertaken closing Route 763.

if the closing of Route 763 were a consequential result of taking part of the Mitchells' farm the damages claimed for such closing would not be recoverable.

Section 612 of the Code makes all condemnors, including the Commonwealth, liable for damages resulting from permanent interference with access to a road or highway. This is simply placing the Commonwealth in the instances listed in Section 612 in the same position as municipal condemnors have been since 1874, and it has been held consistently that in order for liability to exist in the case of municipal condemnors there must be *substantial* impairment of the access. *Hedrick v. Harrisburg*, 278 Pa. 274, 122 A. 281 (1923); *Fecher v. Allegheny County*, 313 Pa. 191, 169 A. 87 (1933); *Hindes v. Allegheny County*, 123 Pa. Superior Ct. 469, 187 A. 219 (1936); *Apple v. City of Philadelphia*, 103 Pa. Superior Ct. 458, 157 A. 325 (1931). "Every slight inconvenience cannot be compensated in damages. The inconvenience here suffered was the same in kind and no greater in degree than could be claimed by all persons in that vicinity. . . . The underlying principle is, damages will not be allowed where the effect of the disturbance to the highway is merely to cause the owner to travel a short distance farther in order to reach the system of streets in that direction." *Spang & Co. v. Commonwealth*, 281 Pa. 414, 418, 126 A. 781 (1924). The road closed was more than a half mile from appellees' driveway. Their farm does not abut that road. Their access to public roads via their private roadway has not been affected. Once on a public road the Mitchells still have several ways to reach Hendersonville and Canonsburg, and the distances to these two towns remain approximately the same as when the Mitchells used Route 519. The Mitchells are in no different position than their neighbors and the public in general as a result of the cutting off of Route 763. As was said by the Supreme Court of California

in *Breidert v. Southern Pacific Company,* 39 Cal. Rptr. 903, 906, 394 P. 2d 719, 722 (1964) : "Not every interference with the property owner's access to the street upon which his property abuts and not every impairment of access, as such, to the general system of public streets constitutes a taking which entitles him to compensation. Such compensation must rest upon the property owner's showing of a *substantial impairment* of his right to access to the general system of public streets." The Mitchells' access to public roads is unaffected by the taking. The fact that they want to use a particular road to reach Route 519 is not such a substantial impairment of access as to be compensable. As the Supreme Court of Missouri recently said in *State of Missouri v. Meier* (Mo.), 388 S.W. 2d 855, 857, cert. den., 382 U.S. 846 (1965) : "The right (to access) does not include the right to travel in any particular direction from one's property or upon any particular part of the public highway right-of-way. . . . Respondent's property right of access has never extended further than the right to enter upon the highway or to leave it and have reasonable connection to the public road system."

We agree with the Commonwealth that it was error to allow the jury to consider the effect of the closing of Route 763 on the "after taking" value of the Mitchell property.

## II.

The second error alleged by the Commonwealth is the trial court's refusal to allow testimony as to the price at which the property had been listed for sale just prior to the condemnation. The offer to sell was made by A. J. Boni, owner of the land at the time of condemnation. On March 26, 1963 Boni conveyed the land and assigned any condemnation award to the Mitchells.

The Commonwealth attempted to bring out the offer-price on cross-examination of W. A. Edwards, an expert witness for the Mitchells, and on direct examination of two of its own witnesses on valuation. In all instances the judge sustained objections to the questions.

The general rule had been that the price at which an owner offered to sell his property if not too remote in time might be elicited on cross-examination of the owner. *Durika v. Derry Township School District,* 415 Pa. 480, 203 A. 2d 474 (1964); *Berger v. Public Parking Authority of Pittsburgh,* 380 Pa. 19, 109 A. 2d 709 (1954). The reason was that such evidence might establish valuation of the property or might bear on the credibility of the owner's valuation at trial. *Young v. Upper Yoder Township School District,* 383 Pa. 320, 118 A. 2d 440 (1955). In addition, such evidence might go to the credibility of other expert witnesses. *Berger v. Public Parking Authority of Pittsburgh,* supra. The question here presented is whether such an offer-price can now be brought out on direct and cross-examination of expert witnesses. We hold that it can in both instances.

Although the Eminent Domain Code of 1964, except for Article IV, became effective June 22, 1964, and applies to all condemnations effected thereafter, Article VII of the Code entitled "Evidence" was also made to apply to steps taken subsequent to June 22, 1964, in proceedings in which the condemnation was effected prior to that date. 26 P.S. §1-302. Since the trial here took place in 1965 evidentiary matters are governed by Article VII of the Code.

Section 705, Article VII, of the Code provides, in part:

"(1) A qualified valuation expert may, on direct or cross-examination, state any or all facts and data which he considered in arriving at his opinion, wheth-

er or not he has personal knowledge thereof, and his statement of such facts and data and the sources of his information shall be subject to impeachment and rebuttal.

"(2) A qualified valuation expert may testify on direct or cross-examination in detail as to the valuation of the property on a comparable market value . . . which testimony may include, but shall not be limited to the following:

"(i) The price and other terms of any sale or contract to sell the condemned property . . . made within a reasonable time before or after the date of condemnation. . . ." 26 P.S. §1-705.

Without expressing any opinion as to its wisdom, we think that Section 705 makes an offer to sell at a certain price listed with a real estate firm if not too remote in time a proper subject for direct or cross-examination of an expert valuation witness. It may be part of the "facts and data which he considered in arriving at his opinion." The comments to Section 705(1) state that the purpose of the clause is to "broaden existing law which unduly limits the examination and cross-examination of an expert witness, so as to permit the expert witness to testify on direct, as well as cross-examination, to any and all matters which he considered (not necessarily 'relied on') in arriving at his opinion of damages." 26 P.S. §1-705, Comment, Joint State Government Commission 1964 Report. Not only might a real estate appraiser consider an offer by an owner to sell at or about the time of condemnation in arriving at his opinion but if it was shown that he didn't consider it the weight of his testimony might be adversely affected.

The Mitchells as assignees of the owner at the time of the condemnation stand in his shoes and there is no validity to their claim that an offer to sell made by

him is not admissible against them simply because they were not the owners at the time the offer was made.

Since we have concluded that a new trial must be granted it is unnecessary to consider the appellant's contention that the verdict was excessive.

Judgment reversed and a new trial granted.